# UNITED STATES DISTRICT COURT

_____NORTHERN_____ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

REGIS ROSARIO-DELEON, aka "Regis Deleon" and "Rey" NOEL RIVERA

CRIMINAL COMPLAINT

CASE NUMBER

MAGISTRATE JUDGE KEYS

09 CR 458

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Starting no later than in or about April 2009 and continuing until the present, at Cook County, in the Northern District of Illinois, defendants,

> conspired with each other and with others known and unknown to knowingly and intentionally posses with intent to distribute and to distribute a controlled substance, namely in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21 United States Code, Section 846 and Title 18, United States Code, Section 2.

I further state that I am a __Special Agent with Federal Bureau of Investigation__ and that this complaint is based on the following facts:

See attached affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes    ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 20, 2009                                 at        Chicago, Illinois
Date                                                          City and State

_____              _____
ARLANDER KEYS, U.S. Magistrate Judge          Signature of Judicial Officer
Name & Title of Judicial Officer

**FILED**

MAY 2 0 2009 TC
May 20, 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

STATE OF ILLINOIS  )
                   )
COUNTY OF COOK     )

## AFFIDAVIT

I, David W. Ostrow, Special Agent, Federal Bureau of Investigation (hereinafter, "FBI"), being duly sworn, states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed for over two years. I have received specialized training in narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including, but not limited to, visual surveillance, general questioning of witnesses, use of search warrants, informant and cooperating witness debriefings, and document analysis. I have been personally involved in investigations of controlled substances-related offenses involving the possession, sale, and distribution of cocaine in the Chicago metropolitan area, and investigations involving distribution of these substances by drug trafficking organizations.

2. I am currently assigned to a Drug Enforcement Administration (DEA) task-force, which investigates, among other crimes, drug trafficking crimes in and around the Chicago metropolitan area. The information in this Affidavit is drawn from my interviews of a cooperating source; information obtained from consensual recordings; controlled purchases of narcotics; physical surveillance; information received from other law enforcement agents; my experience and training; and the experience of other agents. As part of my current assignment, I have investigated criminal violations of the Controlled Substance Act as found in Title 21 of the United States Code, as well as related violations found in Title 18 of the United States Code. Based on my training and

-1-

experience, I am familiar with the ways in which individuals conduct their drug-related business, including, but not limited to their: (a) methods of distributing narcotics; (b) use of telephone communication devices; and (c) use of code words to identify themselves and the nature of the communication.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint charging REGIS ROSARIO-DELEON, also known as "Regis DeLeon" and "Rey," and NOEL RIVERA with violations of Title 21, United States Code, Section 841(a)(1) and 846, it does not contain all the information known to me concerning this investigation.

## *Summary of Investigation*

4. Since approximately December of 2008, the FBI and DEA have been conducting a joint investigation of a suspected drug trafficker named NOEL RIVERA.[1] During the course of the investigation, agents have obtained historical information from a confidential witness, recorded consensual telephone conversations and meetings, conducted physical surveillance, and conducted controlled purchases of narcotics from RIVERA and his various narcotics suppliers, including REGIS ROSARIO-DELEON.[2] Based on the information developed during the investigation to date, RIVERA and ROSARIO-DELEON are responsible for distributing wholesale amounts of narcotics

---

[1] RIVERA was identified by law enforcement through a comparison to his Illinois Driver's License and prior arrest photos.

[2] ROSARIO-DELEON was identified by law enforcement through historical records maintained by the DEA. Also, a comparison between a video consensually recorded on May 11, 2009 and an arrest photo of REJIS DELEON revealed it was the same person. Further, on May 1, 2009, the CS identified a Chicago Police booking photo of REJIS DELEON as the individual the CS knows as "REY."

in the Chicago area.

5. The investigation into the narcotics trafficking activities of RIVERA and ROSARIO-DELEON was initiated based upon information from a confidential source (hereinafter "CS"). The CS was arrested by the FBI on charges of participating in a narcotics conspiracy in the western suburbs of Chicago. Following his/her arrest, the CS agreed to cooperate with the FBI in an effort to receive consideration in charging and sentencing decisions that will be made in connection with his/her case. The CS has not been paid for his/her cooperation. The information provided by the CS has been independently corroborated by physical surveillance, consensual recordings, the controlled purchases of narcotics, and information received from other law enforcement officers.

6. In approximately December of 2008, the CS identified NOEL RIVERA as a former narcotics supplier for the CS. Agents subsequently arranged for the CS to reestablish contact with RIVERA. Consensual recordings conducted in January of 2009, between the CS and RIVERA established that RIVERA was once again willing to supply the CS with cocaine. The CS subsequently made two controlled purchases of cocaine from RIVERA. On January 21, 2009, the CS purchased approximately 118 grams of cocaine from RIVERA for $3,500. On February 5, 2009, the CS purchased approximately 141 grams of cocaine from RIVERA for $4,500.[3]

7. On April 3, 2009, at the direction of FBI agents, the CS attempted to purchase one kilogram of cocaine from RIVERA. On that date, the CS and his/her vehicle were searched for contraband and narcotics with negative results. The CS was also provided with a concealed audio

---

[3] Prior to each controlled purchase, the CS and his/her vehicle were searched for money, drugs, or contraband, with negative results. The CS also wore a concealed audio recorder for both transactions. Additionally, both transactions were conducted under continuous surveillance from law enforcement. The cocaine was entered into evidence and submitted to the DEA North Central Laboratory, where it tested positive for cocaine hydrochloride.

recorder to capture the conversation with RIVERA and any of his co-conspirators. Surveillance observed the CS drive to RIVERA's residence, at which time RIVERA entered the CS' vehicle. During the meeting in the CS' car, RIVERA told the CS that they were going to get the cocaine from RIVERA's brother-in-law. A review of the consensual recording revealed that, at approximately 4:10 p.m., RIVERA used the CS' cellular phone to call his supplier, later identified as ROSARIO-DELEON.[4] RIVERA can be heard on the recording saying in Spanish, "Brother-in-law,[5] what is the address?" After receiving the address from the person on the other end of the call, RIVERA said, "4036 Nelson." RIVERA then directed the CS to that address in Chicago. Subsequently, surveillance saw the CS' car park near 4036 W. Nelson, Chicago, IL (hereinafter the "ROSARIO-DELEON residence") at which time RIVERA exited the CS' car and walked to the rear of the ROSARIO-DELEON residence.

8. On the same date, at approximately 7:38 p.m., surveillance observed RIVERA reenter the CS' vehicle, which was parked near the front of the ROSARIO-DELEON residence. RIVERA said to the CS, "He [meaning ROSARIO-DELEON] wants you to go up there with the money, man. The guy's there with the shit [meaning the cocaine CS intended on purchasing from RIVERA and ROSARIO-DELEON], too. He wants to do everything in the house, nothing on the open street." The CS then asked, "Does he have it for sure?" RIVERA replied, "Yeah. Drive around the block, because that shit's up there, don't stay around here, you might get this place hot [meaning the CS's

---

[4] During the course of this investigation, the CS also spoke with ROSARIO-DELEON at the same telephone number phone records reflect RIVERA called when using the CS's cell phone on April 3, 2009.

[5] It is unclear whether RIVERA and ROSARIO-DELEON are actually brothers-in-law or are simply using this as a familial term.

presence on the street might draw unwanted attention from law-enforcement]." During a subsequent debrief of the CS after the meeting with RIVERA outside the ROSARIO-DELEON residence, the CS told law enforcement that he/she understood that the kilogram was present inside ROSARIO-DELEON's residence, but ROSARIO-DELEON was unwilling to let the kilogram leave the residence without first seeing the money to purchase the kilogram from the CS. The CS also understood from RIVERA that ROSARIO-DELEON was uncomfortable doing any narcotics transactions in public, instead insisting that all transactions take place inside his apartment. Due to the fact that the FBI was unwilling at that time to allow the CS to enter the residence for safety reasons, no transaction took place on April 3, 2009.

9. Following the aborted kilogram transaction on April 3, 2009, the FBI devised a scenario in which the CS would meet with ROSARIO-DELEON inside of the ROSARIO-DELEON residence to discuss a future kilogram cocaine transaction. On April 14, 2009, the CS was provided with a concealed audio recorder[6] and directed to meet with RIVERA and ROSARIO-DELEON inside the ROSARIO-DELEON residence. Surveillance observed the CS pick up RIVERA at RIVERA's residence and then travel to ROSARIO-DELEON residence, where they entered through the rear door and walked up to the apartment on the second floor of the building.[7] The apartment to which the CS and RIVERA walked was the only apartment on the second floor of the two-flat residence. Upon entering the 2nd floor apartment, the CS stated, "Uncle Rey, you look the same,

---

[6] The recording device functioned properly, but, due to the fact that ROSARIO-DELEON spoke in a hush, stilted manner, it was often difficult to hear his portion of the conversation.

[7] While agents did not physically witness the CS and RIVERA walk upstairs, a review of the consensual audio recording reveals what sounds like walking on a wooden staircase. During a debrief of the CS, the CS stated that they walked to the 2nd floor residence.

man." ROSARIO-DELEON, RIVERA, and the CS then discussed the failed kilogram transaction on April 3, 2009. RIVERA stated to the CS, "Don't you remember he used to be the one who gave me the bricks [meaning kilograms of cocaine] to bring to you." The CS explained that he/she was not afraid of ROSARIO-DELEON or RIVERA, but that the CS' customer was afraid that the money for the kilogram would be stolen. The CS later asked about the price for a kilogram of cocaine. RIVERA stated, "He knows about the 34 [meaning $34,000 per kilogram]." ROSARIO-DELEON then said, "It's getting worse now, prices going up, up, up." They then discussed how a future deal would occur. ROSARIO-DELEON stated, "I talk to the guy [meaning ROSARIO-DELEON's narcotics supplier], I say everything is OK, the guy bring it here, you guys come with the money."

10. During a debrief of the CS following the meeting at the ROSARIO-DELEON residence on April 14, 2009, the CS stated that ROSARIO-DELEON told him/her that he does not live at that address, but only does his narcotics trafficking activities there. The CS also stated that he/she saw a scale and approximately 3.5 ounces of cocaine in plain view in the residence. The CS estimated that, during the time the CS was there, approximately seven people came to the second floor apartment and purchased drugs. The CS stated that ROSARIO-DELEON had an office set up and had his customers wait outside of the office for service. The CS further stated that, upon the conclusion of their meeting, RIVERA received 1/16th of an ounce of cocaine from ROSARIO-DELEON. While I was not able to overhear that particular transaction between RIVERA and ROSARIO-DELEON on the audio recording, the fact that such a transaction occurred is substantiated by a conversation between the CS and RIVERA after they entered the CS' car following the meeting. As the CS and RIVERA were driving away, the CS asked RIVERA, "You got shit [meaning narcotics] on you, right?" RIVERA replied, "Yeah, now I got shit on me."

11.     On May 11, 2009, at the direction of the FBI, the CS arranged to purchase approximately nine ounces of cocaine from ROSARIO-DELEON and RIVERA. On that date, agents met the CS at a predetermined location and searched the CS for drugs or contraband with negative results. The CS was then provided with concealed audio/video recording devices as well as $9,000 in government funds.

12.     Surveillance followed the CS to RIVERA's residence, where RIVERA was waiting outside near the street. RIVERA then entered the CS' car and RIVERA and the CS departed the area followed by surveillance. Once RIVERA was in the car, the CS asked RIVERA, "Do you want to call Rey [meaning ROSARIO-DELEON]?" RIVERA responded, "He's waiting for me, I have this all set up already." Surveillance observed the CS and RIVERA drive to and then park near the ROSARIO-DELEON residence. Once they arrived, RIVERA could be overheard on a cellular phone stating in Spanish, "Brother-in-law, I am here." At approximately 3:15 p.m., the CS and RIVERA entered the ROSARIO-DELEON residence through the rear door and walked upstairs to the second floor apartment.[8] Upon entering the 2nd floor apartment, ROSARIO-DELEON and RIVERA talked privately for several minutes while the CS waited in another room. RIVERA then called for the CS to join RIVERA and ROSARIO-DELEON. RIVERA said to the CS, "We got a problem, man. He's [meaning ROSARIO-DELEON] got work [meaning cocaine] here, he's got about six or eight ounces. Prices have changed. To get a nine-piece [meaning nine ounces of cocaine], it's nine-thousand dollars." The CS asked, "What if I give you nine [meaning $9,000]?" RIVERA stated,

---

[8] While agents did not physically observe the CS and RIVERA go to the second floor, a review of the consensual recorded video clearly shows the CS and RIVERA opening the rear door and climbing up an enclosed wooden staircase to the 2nd floor apartment. The 2nd floor apartment is the only dwelling unit on the second floor of the two flat residence.

"That's his cost." ROSARIO-DELEON then said, "I'm not going to be working for nothing. I can give it to you for $9,000, and I'm not making a thing off it. I got eight ounces here, if you want to take eight ounces." The CS then asked, "Can I see it, is it nice?" ROSARIO-DELEON responded, "I'll show you."[9]

13. The CS asked ROSARIO-DELEON, "Rey, when I get the brick [kilogram of cocaine], I'm not gonna pay $1,000 [per ounce]?" ROSARIO-DELEON responded, "Thirty-three [meaning $33,000 for the kilogram of cocaine]." The CS replied, "Done." The CS then asked, "You got a scale?" RIVERA responded, "In this room, he's got everything in this room. He's got a scale." The CS said, "Rey, this is the bomb, dude." ROSARIO-DELEON can be overheard while weighing the cocaine saying, "2,2,2,2." RIVERA confirmed, "Two hundred twenty-two grams [or approximately eight ounces]."

14. The CS and ROSARIO-DELEON then discussed possibly having ROSARIO-DELEON's narcotics supplier bring a full nine ounces to ROSARIO-DELEON's residence because the 222.2 grams was short of nine ounces. The CS asked, "For you to call the guy to come here, it'll take long, right?" ROSARIO-DELEON responded, "He's [meaning ROSARIO-DELEON's supplier] in Aurora." The CS and ROSARIO-DELEON then talked about doing more business in the future. ROSARIO-DELEON stated, "You want 2, 3 [kilograms of cocaine], I give it to you." The CS replied, "I can't do no 2 or 3 a week. One [kilogram] for sure. How much do I need to bring?" ROSARIO-DELEON responded, "Thirty-three [$33,000]."

---

[9] While the audio/video recording functioned properly, large portions of the video are of poor quality due to being in a dimly lit area. While the faces of RIVERA and ROSARIO-DELEON can clearly be seen, most of the transaction that was captured on audio cannot be seen on the video portion of the recording.

15. At approximately 3:45 p.m., the CS was told to wait in another room while ROSARIO-DELEON met with an unknown male. At the same time, surveillance observed an unknown male park near the ROSARIO-DELEON residence and walk through the gangway toward the rear of the residence. While waiting, the CS asked RIVERA, "We can go, right?" RIVERA responded, "No, he's going to see if the guy has a whole nine-piece [nine ounces of cocaine] on him so we can take that instead." Based on that information, it is believed that the unknown male that ROSARIO-DELEON was meeting with was a narcotics supplier. Ultimately, the CS told ROSARIO-DELEON that he/she would take the eight ounces ROSARIO-DELEON had on hand as well as another small plastic bag of cocaine instead of waiting for the full nine ounces. At that time, ROSARIO-DELEON distributed the eight ounces of cocaine as well as the smaller bag containing cocaine to the CS in exchange for $9,000.

16. The CS, RIVERA, and ROSARIO-DELEON then again discussed the future kilogram transaction. The CS asked, "When I'm ready, and I tell you I'm coming for sure, can you call him [ROSARIO-DELEON] and get him ready, so we don't have to wait, this is beautiful [meaning the cocaine provided to the CS was of high quality]." ROSARIO-DELEON responded, "When you get here, the shit [cocaine] should be here." ROSARIO-DELEON continued, "You give him [RIVERA] one [$1,000 for RIVERA's services as broker for the transaction] and bring me the thirty-three [$33,000]."

17. Following the meeting, the CS and RIVERA left the ROSARIO-DELEON residence and departed in the CS' car. The CS' car was surveilled without interruption as the CS dropped off RIVERA and then met agents at a pre-determined location. At that time, the CS provided agents with two small plastic sandwich bags containing suspect cocaine that had been sold to the CS by

ROSARIO-DELEON and RIVERA. The CS was again searched for drugs, money, or contraband, with negative results. The suspect cocaine, which weighed 265.5 grams with packaging, subsequently field-tested positive for the presence of cocaine and was submitted to the DEA laboratory for testing. That analysis has not yet been completed.

18. On May 18, 2009, at approximately 5:03 p.m., the CS, at the direction of law enforcement, had a consensually recorded telephone conversation with RIVERA. The purpose of the call was to discuss and arrange the CS' purchase of one kilogram of cocaine from RIVERA and ROSARIO-DELEON. During the conversation, the CS told RIVERA, "I got everything [meaning the CS had all the money needed to purchase the kilogram of cocaine from RIVERA and ROSARIO-DELEON]. Did you talk to Rey [ROSARIO-DELEON] about making a little bit more?" RIVERA responded, "Yeah, he said we'll see when it gets here, and then we'll talk." The CS then asked RIVERA to contact ROSARIO-DELEON to ensure that the kilogram transaction would happen the next day. The CS said, "Please, can you call me back and let me know? Cause there's no reason for me to pick up the money if Rey says it's gonna take another day or two." RIVERA responded, "Listen, when you told me that you were on your way down [in another call, the CS informed RIVERA that he/she was returning from out of state], he [ROSARIO-DELEON] went and he made a phone call, and they're [ROSARIO-DELEON and his cocaine supplier] already on stand-by, you understand? He already told you he was ready anyway, don't you remember?"

19. Based on this information, on May 19, 2009, I presented an application and affidavit in support of an anticipatory search warrant for the ROSARIO-DELEON residence to Magistrate Judge Arlander Keys. The condition precedent for the anticipatory search warrant was the display of the suspect cocaine to the CS by RIVERA and ROSARIO-DELEON. Judge Keys signed the

anticipatory warrant on May 19, 2009.

20. On May 19, 2009, at approximately 3:00 p.m., the CS picked up RIVERA from his home, as had been previously arranged through phone conversations between RIVERA and the CS. The CS and RIVERA then drove to the ROSARIO-DELEON residence and walked up to the second floor apartment. According to the CS, and corroborated through the consensual recording, ROSARIO-DELEON had only a half kilogram of cocaine available in the apartment. The CS complained that he/she wanted a full kilogram and asked how long it would be for that amount to be delivered. ROSARIO-DELEON informed the CS that it was coming from Elgin and that it would be available in an hour or an hour and a half. The CS and RIVERA then left the ROSARIO-DELEON residence and went to a restaurant for approximately an hour. The CS and RIVERA then drove around the City of Chicago for approximately three hours awaiting word of the arrival of the cocaine. Ultimately, agents decided to call off the transaction for that night.

21. After the decision to terminate the operation for the night was made, the CS received a call from RIVERA and ROSARIO-DELEON, which was not recorded, stating that the kilogram of cocaine had arrived at the ROSARIO-DELEON residence. The CS told ROSARIO-DELEON that he/she could not go forward with the cocaine transaction that night, but was available to complete the transaction at approximately 10 a.m. the next morning [May 20, 2009]. ROSARIO-DELEON agreed to this. The CS agreed to pick up RIVERA the next morning at his residence and bring him to the ROSARIO-DELEON residence where the CS, ROSARIO-DELEON and RIVERA would complete the deal for the kilogram of cocaine.

22. On May 20, 2009, the CS met with agents at a pre-determined location and was searched for money and contraband, with negative results. The CS was provided with audio and

video recording equipment and $34,000 in government funds. At approximately 10:00 a.m., the CS drove, while under continuous surveillance, to pick up RIVERA at his house. As they made their way to the ROSARIO-DELEON residence, the CS showed RIVERA the contents of a black bag containing the $34,000 in government funds. The CS then told RIVERA that he/she and RIVERA would go to ROSARIO-DELEON's second floor apartment and see if the kilogram of cocaine was present. If it was present, the CS would return to the CS' vehicle, retrieve the money, and return to the apartment to complete the deal. RIVERA agreed.

23. At approximately 10:15 a.m., the CS and RIVERA arrived at the ROSARIO-DELEON residence and they walked up to and then went inside ROSARIO-DELEON's second floor apartment. The CS was equipped with a transmitter which allowed Agents to hear what was happening inside of the apartment. From the conversations that were taking place, agents had reason to believe that the kilogram of cocaine was present in the apartment in the form of two half-kilogram packages. The CS and supervising law enforcement personnel had previously agreed on a signal, the removal of a baseball cap, to signify that the CS had seen the cocaine in the apartment when the CS left the apartment and returned to his vehicle. As the CS walked outside, the CS gave agents the signal. At that time, agents on the scene executed the anticipatory search warrant signed by Judge Keys on May 19, 2009. Upon entry into the second floor apartment, agents found and then arrested ROSARIO-DELEON and another individual who was present in the apartment. RIVERA was arrested right outside the front entrance to the ROSARIO-DELEON residence. The other individual was subsequently released.

24. Following the arrests of ROSARIO-DELEON and RIVERA, Agents began to conduct a search of the ROSARIO-DELEON residence. During the course of that search, Agents found

-12-

approximately one-half kilogram of suspect cocaine in the hallway outside of the second floor apartment at the ROSARIO-DELEON residence. Agents also found approximately one-half kilogram of suspect cocaine next to a couch in the living room of the second floor apartment. Additionally, agents seized approximately 75 grams of suspect heroin. This substance field-tested positive for the presence of heroin. Agents also seized over 100 grams of additional suspect cocaine concealed inside a sock inside a bedroom in the apartment.

25. Following their arrest, RIVERA and ROSARIO-DELEON were transported to the FBI Chicago Field Division for processing. At approximately 11:32 a.m., RIVERA was advised of his *Miranda* rights by agents. RIVERA advised that he understood his rights, signed a form indicating such in the presence of two agents, and provided a statement. In the statement, RIVERA admitted to his participation in the kilogram cocaine transaction with ROSARIO-DELEON. RIVERA stated that he was to be paid $1,000 for setting up the kilogram of cocaine transaction.

### *Conclusion*

26. Based on the foregoing, I submit that the foregoing evidence establishes that defendants REGIS ROSARIO-DELEON and NOEL RIVERA conspired and agreed with each other and with others known and unknown to possess with intent to distribute and to distribute controlled substances, namely, in excess of 500 grams of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and did aid and abet said conspiracy, in violation of Title 18, United States Code, Section 2.

_____
DAVID W. OSTROW
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
this 20th day of May, 2009

_____
HONORABLE ARLANDER KEYS
United States Magistrate Judge